Filed 9/23/24  P. v. Hernandez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RANGEL GUMESINDO HERNANDEZ,<br><br>    Defendant and Appellant. | C098627<br><br>(Super. Ct. No. STK-CR-FECOD-2020-0007801) |

A jury found defendant Rangel Gumesindo Hernandez guilty of first degree murder and found true a personal use of a firearm enhancement.  He was sentenced to life without the possibility of parole for murder, plus 25 years to life for the firearm enhancement.  His primary argument on appeal is that it was error to permit a detective to testify about events shown on a surveillance video that captured part of the incident because that testimony invaded the province of the jury and a small portion of it constituted hearsay.  We disagree.  Instead, we conclude the detective's testimony constituted lay opinion that was helpful to the jury and thus admissible.  We also find no

1

hearsay problem. We agree, however, that a parole revocation fine does not apply in this case and must be stricken, and the abstract of judgment must be corrected to accurately reflect his sentence.

## FACTUAL BACKGROUND

We note at the outset there were two codefendants — Alonzo Talavera and Daniel Miranda-Lick — who were charged with conspiracy to commit robbery and attempted robbery, but not with murder. Apparently, both took plea deals and Hernandez proceeded to trial on his own.

The victim lived at a home in Stockton with his wife and two children. He was shot in front of his house at around 2:30 p.m. on January 13, 2020, and he died a short time later.

The victim's wife testified she was leaving the house at around 2:20 p.m. the day of the shooting, and she saw two masked men in the front yard. One man looked Hispanic and the other was Black. The Hispanic man was carrying a gun by his right leg and "trying to hide it." She yelled for her husband, and he came outside. She took her 11-year-old son to a bedroom at the back of the house to get him away from the front door. She returned to the front of the house and saw her husband trying to get the two men out of the yard. The men left and her husband followed them. She went back to check on her son, and when she returned to the front of the house her husband was standing in the driveway. He was bleeding and he yelled at her to call an ambulance. She called 911 at approximately 2:28 p.m., and police and medical personnel arrived shortly thereafter. She did not hear a gunshot.

The victim's son testified he was playing Minecraft in the living room when he saw his mom going out and then "scream[]" for his dad. He went to the front door, looked outside, and saw two men, one of whom was holding a gun or a rifle. He saw his dad run to the porch, look at the man with the gun, and raise his hands. His mom told him to go inside, and he went to the back of the house. He did not see anything else.

2

Officers Sears and Villalobos arrived at the scene shortly after the 911 call.  The victim was lying in the street in front of his house and was bleeding.  Officer Sears located a bullet wound in his chest.  Somebody in the background yelled out that the suspects were two Black men, and the victim, who was conscious at this point, corrected the person and said it was one Black man and two Hispanic men.  Officer Villalobos asked the victim what happened, and he said two Hispanics and a Black man "were trying to rob me."  Officer Sears searched the area and found a marijuana grow enclosure in the backyard, and "a lot" of marijuana plants drying in the garage.  Officer Sears also spoke to the victim's son, who said he did not see a firearm.  Police found a single spent shell casing from a .22-caliber rifle on the north side of the street.

The victim was transported to the hospital, where he was pronounced dead.  The medical examiner determined the cause of death was a gunshot wound to the upper torso.  He also observed abrasions consistent with "stippling" on the right side of the victim's rib cage, and he explained stippling can be caused when a gun is fired at close range, or within "a couple of feet" of the body.

Detective Mohammed was the investigating officer.  He obtained surveillance video from a house located across the street and approximately one house down from the victim's house, and this video was admitted into evidence.  We will discuss Detective Mohammed's testimony about the video in more detail below because it is the focus of this appeal.  For present purposes it is sufficient to note the video shows the following.  At around 2:19 p.m., a white minivan drives past the camera, followed by a gray sedan.[1]  At around 2:23 p.m., the white minivan appears again, this time traveling from the opposite direction, and it pulls up to the curb and parks.  Someone gets out of the driver's

---

[1]     All times are approximate.  Detective Mohammed testified the timestamp on the video was off by one hour and 43 minutes.  So, for example, if the timestamp says 04:02:34 p.m., the real time is approximately 2:19 p.m.

side, walks around the front of the minivan to the sidewalk, and then walks towards the victim's house. Moments later, a second person, who appears to have gotten out of the passenger's side of the minivan, can be seen walking on the sidewalk towards the victim's house. About three minutes later, a person can be seen walking from the direction of the victim's house back towards the white minivan. Before reaching the minivan, this person pauses, turns back towards the victim's house, and takes what Detective Mohammed described as a "shooting stance," then he turns and jogs to the driver's side of the minivan and gets in. As this person opens the door of the minivan, an object can be seen in his right hand, and Detective Mohammed testified it looked "consistent with a rifle," but he could not say for certain. A second person then runs into view from the direction of the victim's house and towards the passenger's side of the minivan, and the minivan drives off at approximately 2:28 p.m., followed about 20 seconds later by the gray sedan.

Detective Mohammed also obtained surveillance video from a house located approximately a block and a half from the shooting. This video shows the white minivan and the gray sedan entering the area at around 2:19 p.m., and leaving at around 2:28 p.m.

Finally, Detective Mohammed obtained surveillance video from multiple cameras located in and around Rancho San Miguel market, which is about .7 miles from the shooting.[2] The surveillance video shows a person later identified as Hernandez exiting the market about an hour before the shooting, along with codefendant Talavera and V.R.; Hernandez is wearing a black short sleeved t-shirt, black pants, and a red baseball cap. The video also shows a person later identified as codefendant Miranda-Lick exiting the market about forty minutes later; Miranda-Lick is wearing a dark long-sleeved jacket with a white collar and a black baseball cap. Surveillance video also shows the white

---

[2] We have not been provided with a copy of this video.

4

minivan and the gray sedan in the parking lot of the market. Detective Mohammed testified the person in the black shirt and pants and red baseball cap (i.e., Hernandez) can be seen getting into the driver's side of the minivan, and the person with the white collar (i.e., Miranda-Lick) can be seen getting into the passenger's side. The white minivan leaves the parking lot at around 2:16 p.m., and the sedan follows shortly thereafter.

The white minivan belonged to V.R., who used to date Talavera. V.R. testified that at around noon on the day of the shooting, she and Talavera drove separately to Hernandez's house, and she dropped off her minivan because Hernandez "wanted to borrow it. And in return, he was going to do some work on my car." After dropping off the minivan, V.R. and Talavera drove to the victim's house; although V.R. did not know the victim, she identified him and his house from photos. After smoking marijuana, V.R. and Talavera left the victim's house to get lunch at Rancho San Miguel, and Hernandez pulled up in the minivan and met them. V.R. and Talavera then went back to the victim's house. V.R. testified Talavera was going to get a sample of marijuana from the victim and try to help the victim sell it. V.R. did not know where Hernandez went with her minivan after they left Rancho San Miguel. V.R. picked up the minivan from Hernandez's house later that afternoon.

L.N. is Hernandez's ex-girlfriend. She testified pursuant to a plea agreement in a different case.[3] In January 2020, Hernandez told her he and Talavera were planning to rob someone's marijuana plants. Talavera knew the intended victim, but Hernandez did not. The plan was for Talavera and "some other female" to go to the victim's house to hang out, then make an excuse to leave and "that's when [Talavera] would notify [Hernandez] that it was the right time to come to the house." L.N. was originally supposed to drive Hernandez to and from the robbery, but she backed out at the last

---

[3]     She pled guilty to arson and second degree burglary.

minute when she learned Hernandez had borrowed a car from another woman.  She got jealous and told Hernandez she wasn't going.

Text messages between L.N. and Hernandez were introduced into evidence.  The day of the robbery, Hernandez sent the following texts to L.N. between 12:11 p.m. and 12:40 p.m.:  "I'm nervous.  But I'm leaving to go do this."  "I'm in a van."  "They went there to give me the inside of how many people and when I should move in."  At around 4:25 p.m., Hernandez sent L.N. a text that said, "I'm glad you didn't go," and "I'm not okay right now.  My head is all fucked up."

L.N. testified she went to Hernandez's house later that evening.  He looked upset and told her it "didn't end well" and he "ended up shooting the guy."  He told her "Daniel" and an unnamed "black male" were also involved in the robbery.  Hernandez indicated he was the shooter, and nobody else fired a weapon.  The next day, L.N. saw Hernandez with a rifle.  He told her it was a .22 and he was trying to sell it.  That same day, Hernandez sent text messages to four different people about selling a .22-caliber rifle.

Hernandez testified on his own behalf.  He described the robbery plans in much the same way L.N. did.  He admitted he and Miranda-Lick drove V.R.'s minivan from the Rancho San Miguel market to the victim's house, where they intended to "take his marijuana from him."  A Black male was also with them, and he was driving the gray sedan.  When asked who the Black male was, Hernandez responded, "I have not a clue.  I don't know the man," and "I don't know anything about him."  He testified he did not have a gun because his "intentions were never to hurt no one" and Miranda-Lick and the Black man did not have guns either.  The robbery "failed" because "[w]e weren't getting nothing from him," and they thus left.  Hernandez testified he did not fire a gun, did not shoot the victim, and did not hear a gunshot.

Hernandez watched the surveillance video taken from the house across the street.  He identified himself as the driver of the minivan and Miranda-Lick as the passenger.  He

6

was asked if he raised his arms in a shooting stance and fired at the victim, and he replied, "I may have raised my arm[s], but I didn't shoot no one." When asked why he raised his arms, he said it was to motion to Miranda-Lick "[t]o say, let's get the hell out of here." When asked about the object that can be seen in his right hand as he gets into the minivan, he said he wasn't sure what it was, but it may have been his keys, which he carries on a black nylon strap that is about a foot long. Hernandez testified he sold a .22-caliber rifle around this time, but he does not remember when he sold it or who he sold it to. He testified the rifle he sold had nothing to do with the robbery, and he regularly buys and sells guns.

The jury found Hernandez guilty of first degree murder and found true the allegation that he personally used a firearm. He was sentenced to life without the possibility of parole for the murder, plus 25 years to life for the gun enhancement.[4] He filed a timely notice of appeal.

## DISCUSSION

Hernandez's primary argument is that the trial court erred by permitting Detective Mohammed to testify about the surveillance video. He also asks us to independently review an in camera hearing on a *Pitchess*[5] motion, and he argues a $1,000 parole revocation fine must be stricken and the abstract of judgment must be corrected to reflect the true sentence. We address each argument in turn.

---

[4]    He was also found guilty of conspiracy to commit robbery and attempted robbery, and was sentenced on both counts, with those sentences stayed. He does not challenge his conviction or sentence on these counts, and we thus do not discuss them further.

[5]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

7

# I

## *Detective Mohammed's Testimony*

Hernandez argues Detective Mohammed's testimony about the surveillance video constituted improper expert or lay opinion. He also argues a small portion of that testimony was hearsay. He argues the admission of this testimony was error and rendered his trial fundamentally unfair. "We review a trial court's rulings on the admission and exclusion of evidence under the abuse of discretion standard." (*People v. Thompson* (2010) 49 Cal.4th 79, 128.)

Before turning to the merits, we briefly note two things. First, Detective Mohammed testified about numerous surveillance videos obtained from three different locations, but Hernandez challenges only a small portion of Detective Mohammed's testimony about the surveillance video from the house across the street from the victim's house. In particular, he challenges Detective Mohammed's testimony that, in the seconds before the white minivan drives away, Hernandez took a shooting stance and appeared to be holding an object that looked like a rifle.

Second, the People argue Hernandez forfeited the claimed evidentiary errors by failing to object to Detective Mohammed's testimony on the specific grounds he now asserts on appeal. Anticipating the People's forfeiture argument, Hernandez makes a preemptive ineffective assistance of counsel claim. Arguably, Hernandez did not forfeit the claimed error. As we note below, he filed motions in limine regarding the propriety of testimony about the videos, and he also objected (albeit somewhat generally) to some of Detective Mohammed's testimony. But even if we were to agree he forfeited the alleged errors, we elect to address his arguments on the merits. (See *People v. Son* (2020) 56 Cal.App.5th 689, 696, fn. 1 (*Son*) ["We elect to address the objections on their merits rather than address the ineffective assistance of counsel claim"].)

With this in mind, we turn to the merits of the claimed evidentiary errors.

8

Prior to trial, Hernandez filed a motion in limine regarding "inflammatory, prejudicial or speculative" testimony about the videos, because "[t]he narrator may so color the perception of the trier of fact, that the jury's own observations would be unduly influenced by the witness's suggestive commentary." At a hearing on the motion, the trial court stated it would grant the motion as to such comments, and it also noted, "if there is a specific objection . . . as the witness is testifying, certainly make it." Hernandez also requested an "admonishment against all comments constituting an opinion by the narrator, within any narration accompanying or following presentation of the video evidence," and he cited Evidence Code section 801, which governs the admissibility of expert testimony. The trial court stated it was not entirely sure what Hernandez was asking for, and it noted, "if an officer is looking at a video from a store, he can narrate that he viewed the video, and that it's his opinion that the person on the video is the Defendant, or the victim, or whoever. [¶] That's lay opinion testimony. That's not expert opinion. And I think anybody can give that." Defense counsel responded, "And as long as it is identified as opinion testimony, I have no objection. But when it comes to an opinion that, this is the one, that, I would object to," and the court stated, "Fair enough. I think ultimately that's up to the jury to determine what the facts are."

At trial, Detective Mohammed testified about the video as it was played for the jury. Here, in full, is the portion of Detective Mohammed's testimony that Hernandez challenges (and we note Hernandez quotes this entire portion of testimony without clearly identifying which portions he objects to; we have italicized the portions Hernandez appears to object to):

> PROSECUTOR: "And we're paused now at 4 hours, 10 minutes, 30 seconds. The player is at 12 minutes and 53 seconds. Hitting play.
>
> "(Video played.)

9

"[PROSECUTOR:] Okay, I'm pausing at 4 minutes — 4 hours, 10 minutes, 34 seconds. The player is at 12:59. What are we looking at now?

"[MOHAMMED:] *At this point, he's kind of turned back in the direction of* [*the victim's house*]. *Earlier described to me as the shooting stance. Both his arms were kind of raised parallel to the ground.*

"[PROSECUTOR:] Can you demonstrate to the jury?

"[MOHAMMED:] *In this case, he's standing up. Obviously, he's not sitting. His arms were up. His feet were kind of placed to give him a little more balance. They're not right next to each other. One is farther ahead than the back one.*

"[DEFENSE COUNSEL:] I'm going to object as speculation, given the image that is being presented. That is not clear at all.

"THE COURT: Overruled. You can explore that on cross-examination.

"[PROSECUTOR:] Can you — Detective, can you tell us what is this in the foreground here in the yard of [the house across the street]?

"[MOHAMMED:] Are you talking about the dogs against the fence?

"[PROSECUTOR:] Yeah. So, you can actually see two dogs against the fence?

"[MOHAMMED:] Yes.

"[PROSECUTOR:] And they actually appear to be looking towards this individual in the shooting stance, correct?

"[MOHAMMED:] Correct.

"[PROSECUTOR:] Okay. I'm hitting play at 4 hours, 10 minutes, 34 seconds. I'm pausing at 4 hours, 10 minutes, 39 seconds. The player is at 13:05. Can you tell me what we just saw?

10

"[MOHAMMED:] *So, the gentleman, something happened. Because you can notice the dogs are on the bottom at the fence, suddenly turned away and scampered off. The individual turned around walking back towards the white van. Started reaching towards the door handle to open it. And it appears you can make something out next to his body, straight — long and straight, which would be consistent with a rifle.*

"[PROSECUTOR:] And I'm not sure if we're going to see it at this — okay, I rewound it back to 4 hours, 10 minutes, and 38 seconds. So you indicated you thought something that looked like a rifle?

"[MOHAMMED:] *Well, you could tell there is something. It's consistent with it. Obviously, with the quality of it* [i.e., the video]*, I can't say for certain. It's long and straight and kind of got it.*

"[PROSECUTOR:] How do you actually — or where do you see it in the film?

"[MOHAMMED:] *So, as he's walking, his one arm is kind of downward. Left arm, which would be kind of how we're taught to carry rifles on the range.*

"[PROSECUTOR:] Let me ask you, because it looks like — so, I'm going to move it frame by frame from 4 hours, 10 minutes, 38 seconds. And at this point, we can see the individual approaching the driver's side of the van, correct?

"[MOHAMMED:] Yeah.

"[PROSECUTOR:] And he's reaching towards the driver's side door of what looks like his left hand, correct?

"[MOHAMMED:] Correct.

"[PROSECUTOR:] It appears at this point, at 4 hours, 10 minutes, and 39 seconds, he's either touching the doorknob or close to it, correct?

"[MOHAMMED:] Fair to say. Yes.

11

"[PROSECUTOR:]  And then, as he opens the door, we can now see an object, and you can't really see it.

"[MOHAMMED:]  *It's pretty — it's hard to see because it's pretty thin.  It's not as thick as his leg.*

"[PROSECUTOR:]  When you reviewed the video, could you see an object contrasted against the van at this point?

"[MOHAMMED:]  *Yeah.  I think it was a little bit easier to see on a monitor.  Kind of when it's right in front of you than broadcasted on the projector.  It's not super clear.  But, you can make something out.*

"[PROSECUTOR:]  Your Honor, at this point, can I move Exhibit 12 [the video] into evidence?

"THE COURT:  Any objection, [defense counsel]?

"[DEFENSE COUNSEL:]  Yes, I do object.  The video is not clear.  And it fails to meet a basis for the — the assumptions that are made about what it's presenting.

"THE COURT:  Overruled.  The video speaks for itself. And we have stipulation number 4."**6**

B.     *Detective Mohammed's testimony constitutes admissible lay opinion*

Hernandez argues Detective Mohammed's testimony that the person in the video took a shooting stance and was carrying what appeared to be a rifle was improper opinion testimony,**7** that should not have been admitted because the jury could view the video and

---

**6**     Stipulation No. 4 is that this video "fairly and accurately depicts the area of [the victim's house] as it appeared on January 13, 2020."

**7**     He never definitely states whether it is expert opinion or a lay opinion.  Most courts analyze such testimony as lay opinion, and we do as well.  (See, e.g., *Son, supra*, 56 Cal.App.5th at pp. 695-697 [analyzing such testimony as lay opinion]; *U.S. v. Begay* (9th Cir. 1994) 42 F.3d 486, 502 ["Contrary to [defendant's] assertion, [a police officer's] testimony [about a videotape of an incident] was not admitted as expert testimony . . . but as opinion testimony by a lay witness"]; *State v. Watson* (2023) 254 N.J. 558, 600 [298 A.3d 1049, 1073] ["If an investigator simply watches a video multiple times, and

decide on its own whether the person took a shooting stance or was carrying a rifle. We find no error in admitting Detective Mohammed's testimony.

Preliminarily we note that, in his testimony, Hernandez identified himself as the person in the video about whom Detective Mohammed was testifying. This is thus not a case where there is a dispute about *who* can be seen in the video. Instead, the dispute is about *what that person is doing*.

*Son, supra*, 56 Cal.App.5th 689 is instructive. There, a detective was permitted to testify about a surveillance video that showed the defendant assaulting the victim. At an Evidence Code section 402 hearing to determine whether the detective would be permitted to testify about the video, she stated she had viewed it numerous times and "discerning the exact events that transpired was difficult because 'there's so much going on.' " (*Son*, at p. 695.) She stated the first time she viewed the video, she did not notice certain events, including a "shiny object" or " 'stabbing instrument' " fly out of the defendant's hand midway through the assault, but she was able to perceive those events after repeated viewings. (*Ibid*.) At trial, the video was played for the jury while the detective described what it showed. The detective testified the defendant made a " 'thrusting motion that appeared to be a stabbing motion' " at the victim's upper body while holding what appeared to be a "shiny object." (*Id*. at p. 693.) She testified the defendant fell on his rear, his hand swung out, and the object he was holding fell to the ground. She testified the defendant and the victim struggled, and the defendant retrieved the object he had dropped, and then charged at the victim and made four or five stabbing or thrusting motions at the victim's upper body. (*Ibid*.) The jury found the defendant

---

even slows it down to better grasp what it reveals, it is not clear the person has acquired 'scientific, technical, or other specialized knowledge,' as the rule [on expert testimony] requires. [Citation.] Put another way, what type of expert would investigators who have viewed a complex video with care be? What specialized knowledge do they possess? To what field of expertise to they belong"].)

guilty of first degree murder, and also found true the personal use of a deadly weapon enhancement. (*Id*. at p. 691.)

The defendant appealed, arguing the trial court erred in permitting the detective to describe the events on the video. During the trial, he had objected that " 'the video really does speak for itself,' " the detective's testimony about the video was "not helpful," and " 'the jury should decide what they see.' " (*Son, supra*, 56 Cal.App.5th at p. 696.) On appeal, he argued the detective's testimony was inadmissible lay opinion. (*Ibid*.) The court disagreed.

The court began by citing Evidence Code section 800, which governs the admissibility of lay opinion testimony and provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." The court then explained: "Preliminarily, we fail to see any opinions expressed in [the detective's] testimony. She essentially just testified to what she saw. Defendant has not pointed to any portion of her testimony that is disputed. If she had witnessed the actual murder and given the exact same testimony, we certainly would not characterize it as opinion testimony. It would be percipient testimony. Why does it become an opinion just because she saw it in a video? [¶] But assuming, for the sake of argument, that her testimony does consist of opinion testimony, the court did not abuse its discretion in finding that it was helpful for the jury. [The detective] testified she watched the video at least 50 times and that subsequent viewings revealed details she had not picked up on at first. While it is true, as defendant argues, that the jury could have watched the video repeatedly and picked those details up on their own, the standard is not whether the testimony was essential. It's whether it was helpful. Here, the jury was able to speed up the process of teasing out obscure details in the video with the aid of [the detective's] testimony. That was helpful." (*Son, supra*, 56 Cal.App.5th at p. 697.)

14

The court also briefly noted two federal cases where police officers were permitted to testify about or narrate events shown on a surveillance video. In one case, the court held " 'an officer who has extensively reviewed a video may offer a narration, pointing out particulars that a casual observer might not see' " because such narration can " 'help[] the jury understand the import of the videos.' " (*Son, supra*, 56 Cal.App.5th at p. 697, citing *U.S. v. Torralba-Mendia* (9th Cir. 2015) 784 F.3d 652, 659-660.) And in the other case, the court permitted an officer to narrate a video he had viewed numerous times because " '[t]o have the jury do likewise [i.e., view the video numerous times] would be an extremely inefficient use of the jury's and the court's time.' " (*Son*, at p. 697, citing *U.S. v. Begay, supra*, 42 F.3d at p. 503.)

So, too, in this case. The quality of the surveillance video in question is poor and it is long, and both of these circumstances make it difficult to pick out the relevant details. As in *Son*, Detective Mohammed's testimony "helped the jury process the details of the surveillance video" and notice things they might otherwise miss. (*Son, supra*, 56 Cal.App.5th at p. 697.) This is particularly true with respect to the object that Hernandez is holding in his hand as he gets into the minivan. Without Detective Mohammed's testimony pointing out *where* and *when* to look, it is very difficult to see the object, or even to see that Hernandez is holding an object. Detective Mohammed's testimony was thus helpful to the jury. Moreover, Detective Mohammed did not testify the object *was* a rifle — just that it was consistent with a rifle because it was "long and straight" and "pretty thin." He acknowledged several times he could not say for sure it was a rifle because the video quality was poor, testifying, "Obviously, with the quality of it, I can't say for certain," and, "it's hard to see because it's pretty thin," and, "It's not super clear. But, you can make something out." We also note the prosecutor introduced a still image from the video (People's exhibit No. 20) to help the jury see the object Detective Mohammed was testifying about. Although the still image is blurry, it does appear that Hernandez is holding a dark, long, and thin object that is visible against the

15

white minivan. Detective Mohammed's testimony about the object in Hernandez's hand is similar to the detective's testimony in *Son* that the defendant was holding a "shiny object" or a " 'stabbing instrument.' " (*Son, supra*, 56 Cal.App.5th at p. 695.) And as in *Son*, we conclude Detective Mohammed's testimony was admissible lay opinion.

As for Detective Mohammed's use of the phrase "shooting stance," given the poor quality of the video and the fact that things happened so quickly, we find that pointing out this critical moment was also helpful to the jury. Indeed, this moment lasted all of three seconds, if that. Moreover, Detective Mohammed explained why it appeared Hernandez took a shooting stance — "Both his arms were kind of raised parallel to the ground." "His feet were kind of placed to give him a little more balance. They're not right next to each other. One is farther ahead than the back one." Detective Mohammed's testimony was similar to the detective's testimony in *Son* that the defendant made a " 'thrusting motion that appeared to be a stabbing motion' " while holding what appeared to be a "shiny object." (*Son, supra*, 56 Cal.App.5th at p. 693.) Once again, as in *Son*, we find Detective Mohammed's testimony was admissible lay opinion.

Hernandez does not mention *Son* in his opening brief. In his reply he argues it is distinguishable because the detective in that case testified she viewed the surveillance video numerous times and that subsequent viewings revealed details she had not initially noticed, but Detective Mohammed did not provide similar testimony. Detective Mohammed may not have testified how many times he viewed the video or that he first noticed certain details on subsequent viewings, but it is implicit from his overall testimony that he had to view the video many times to pick out all the relevant details.

In his reply, Hernandez also cites extensively from *State v. Watson, supra*, 298 A.3d 1049, a recent decision by the New Jersey Supreme Court that addresses "the extent to which investigators may narrate video recordings." (*Id*. at p. 1055.) Although Hernandez recognizes we are not bound by *Watson*, he urges us to "reflect" on some of the potential issues with narration testimony that it identifies. However, fairness counsels

16

against considering a case cited for the first time in a reply brief, because the People have not had the opportunity to address it. (*In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1477-1478.) And even if we were to consider *Watson*, it is not clear it assists Hernandez because it held an investigator may generally "draw[] attention to key details [in a video] that a jury might otherwise overlook — as is the case, for example, with a potentially confusing, complex, or unclear recording — [because] such evidence can be particularly helpful" to the jury. (*Watson*, at p. 1055.) That is what Detective Mohammed's testimony did in this case.

## II

### *Testimony Challenged as Hearsay*

Next, Hernandez highlights the following portion of Detective Mohammed's testimony about the video: "At this point, he's kind of turned back in the direction of [the victim's house]. *Earlier described **to** me as the shooting stance.* Both his arms were kind of raised parallel to the ground." (Italics and bolding added.) Hernandez argues it is clear from the italicized language — and, in particular, by the word "to" — that Detective Mohammed is testifying that some unidentified person described the shooting stance to him, and he is telling the jury what that other person described to him, which would be hearsay. We disagree. When Detective Mohammed's testimony is read in context, it is clear to us that he meant, "Earlier described **by** me as the shooting stance," because he had earlier testified, "you can see an individual towards the right frame of the video take what appears to be, like, a shooting stance," and he never suggested someone else described the video to him that way. Either the transcript is wrong, or Detective Mohammed misspoke. Either way, we see no hearsay problem.[8]

---

[8]     Because we find no error in admitting Detective Mohammed's testimony, we need not address Hernandez's cumulative error argument.

17

## III

## Pitchess *Motion*

"A criminal defendant has a limited right to discovery of peace officer personnel records. The guidelines and motion procedure for such discovery were first established by the California Supreme Court in *Pitchess v. Superior Court, supra*, 11 Cal.3d 531." (*California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1019.) A motion to obtain such records is known as a *Pitchess* motion. (*Ibid*.) Hernandez filed a *Pitchess* motion seeking Detective Mohammed's personnel records.[9] After holding an in camera hearing with the custodian of records for the Stockton Police Department and the city attorney, the trial court determined "there is nothing to disclose." Hernandez asks us to independently review the reporter's transcript of the hearing in order to determine whether Detective Mohammed's records were properly withheld. (See, e.g., *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1232.) We have done so and agree with the trial court that there is nothing to disclose.

## IV

### *Errors in the Abstract of Judgment*

Hernandez has two minor challenges to the sentence and abstract of judgment. First, he argues a $1,000 parole revocation fine imposed pursuant to Penal Code section 1202.45 must be stricken because he was sentenced to life without the possibility of parole. The People agree, and we do as well. Penal Code section 1202.45, subdivision (a), provides, "In every case where a person is convicted of a crime *and his or her sentence includes a period of parole, the court shall*, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, *assess an additional parole revocation restitution fine* in the same amount as that imposed pursuant to subdivision (b)

---

[9] He sought these records because Detective Mohammed was apparently arrested in 2018 for domestic violence.

18

of Section 1202.4." (Italics added.) When, as in this case, a defendant is sentenced to life without the possibility of parole, the parole revocation fine is not applicable and may not be assessed. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1184.)

Second, Hernandez argues the abstract of judgment must be corrected to reflect the true sentence imposed. At the sentencing hearing, the trial court sentenced Hernandez to life without possibility of parole for the murder count (count 1), plus 25 years to life for the gun enhancement to be served consecutively; sentences on the remaining counts and enhancements were stayed. Hernandez's aggregate sentence is thus life without the possibility of parole, plus 25 years to life. The amended abstract of judgment, however, does not check box No. 4 — "Life without the possibility of parole," and under "Other Orders," on the abstract of judgment for the indeterminate term, it states, "Count 1: 25 years to life without parole," and on both the indeterminate term and the determinate term, "Total term imposed is: 50 years to life without the possibility of parole." Hernandez argues the abstract of judgment thus must be corrected. The People agree, and they point out a similar error in the minute order. We agree as well. "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) We will direct the trial court to correct the amended abstract of judgment and the minute order to reflect a sentence of life without the possibility of parole on count 1, and 25 years to life for the gun enhancement.

# DISPOSITION

This matter is remanded to the trial court with directions to correct the amended abstract of judgment and the minute order to reflect that the sentence in count 1 is 25 years to life without parole, and 25 years to life for the gun enhancement. The abstract of judgment should reflect that the total term is 25 years to life without parole, plus 25 years to life. The trial court is also directed to vacate the parole revocation fine. In all other respects, the judgment is affirmed.


                                          /s/
                                          EARL, P. J.


We concur:


        /s/
ROBIE, J.


        /s/
RENNER, J.

20